**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JAMES ROAT,

                              Plaintiff,

      v.                                                No. 07-CV-21
                                                  (LEK/DRH)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

_____

**APPEARANCES:**                        **OF COUNSEL:**

MARK A. SCHNEIDER, ESQ.
Attorney for Plaintiff
57 Court Street
Plattsburgh, New York 12901

HON. RICHARD S. HARTUNIAN        ANDREEA L. LECHLEITNER, ESQ.
United States Attorney for the         Special Assistant United States Attorney
    Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

      Plaintiff James Roat ("Roat") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner")

denying his application for benefits under the Social Security Act.  Roat moves for a

finding of disability and the Commissioner cross-moves for a judgment on the

pleadings.  Dkt Nos. 9, 13.  For the reasons which follow, it is recommended that the

_____

     [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

Commissioner's decision be remanded.

## I. Procedural History

In December 2004, Roat filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. T. 71-77.[2]  That application was denied on February 28, 2005.  T. 21-24.  Roat timely appealed, requesting a hearing on or about March 29, 2005.  T. 31, 37, 90-96.  On April 20, 2006, a hearing was held before the administrative law judge ("ALJ") Terence Farrel.  T. 43-46, 355-99. In a decision dated July 20, 2006, the ALJ held that Roat was not entitled to disability benefits.  T. 8-17.  Roat filed a timely request for review with the Appeals Council, which was denied on December 8, 2006, thus making the ALJ's findings the final decision of the Commissioner.  T. 4-6.  This action followed.

## II. Contentions

Roat contends that the ALJ erred in (1) finding that, pursuant to either the guidelines or his obesity, both Roat's mental condition and his obesity were not of sufficient severity to constitute a listed condition, (2) not considering properly the medical opinions and other evidence of record, (3) finding that Roat was not credible, and (4) concluding that Roat retained sufficient residual functional capacity (RFC) to perform both his past work, and work in general.

_____

[2]"T." followed by a number refers to the page of the administrative record. Docket No. 7.

2

### III. Facts

Roat is currently forty years old and has successfully obtained his General Educational Development ("GED") certificate and completed nurses aide training.  T. 14-15, 363-64.  Roat's previous work experience includes being a laborer in factory and production work, nurse's aide, and dishwasher.  T. 364-69.  Roat alleges that he became disabled on January 1, 2004 due to depression, anxiety, and suicidal behaviors.  T. 71-72.

### IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational

3

background, age, and work experience." <u>Ventura v. Barnhart</u>, No. 04-CV-9018(NRB),

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing <u>Mongeur v. Heckler</u>, 722 F.2d

1033, 1037 (2d Cir. 1983)).

    The Second Circuit employs a five-step analysis, based upon 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he [or she] is not, the
> [Commissioner] next considers whether the claimant has a 'severe
> impairment' which significantly limits his [or her] physical or mental ability
> to do basic work activities.  If the claimant suffers such an impairment,
> the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment which is listed in Appendix 1 of the
> regulations.  If the claimant has such an impairment, the [Commissioner]
> will consider him [or her] disabled without considering vocational factors
> such as age, education, and work experience; the [Commissioner]
> presumes that a claimant who is afflicted with a 'listed' impairment is
> unable to perform substantial gainful activity.  Assuming the claimant
> does not have a listed impairment, the fourth inquiry is whether, despite
> the claimant's severe impairment, he [or she] has the residual functional
> capacity to perform his [or her] past work.  Finally, if the claimant is
> unable to perform his [or her] past work, the [Commissioner] then
> determines whether there is other work which the claimant could perform.

<u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial

burden of proof to establish each of the first four steps.  <u>DeChirico v. Callahan</u>, 134

F.3d 1177, 1179-80 (2d Cir. 1998) (citing <u>Berry</u>, 675 F.2d at 467).  If the inquiry

progresses to the fifth step, the burden shifts to the Commissioner to prove that the

plaintiff is still able to engage in gainful employment somewhere.  <u>Id.</u> at 1180 (citing

<u>Berry</u>, 675 F.2d at 467).

**B. Scope of Review**

    In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## V.  Discussion

### A. Medical Evidence

### 1. Work History

Roat has not engaged in any substantial gainful activity since the alleged onset of disability on January 1, 2004.  T. 13.  The record and Roat's testimony indicate that he has previous work attempts, but that those attempts were unsuccessful because

5

Roat's impairments compelled him to leave prior to reaching his three month employment anniversary.  Id.

### 2. Mental Health Treatment

On December 10, 2004, Roat was evaluated at the Essex County Mental Health ("Essex") crisis team for symptoms consistent with depression and anxiety.  T. 136-37. While Roat was noted to be cooperative, alert and oriented, have a logical thought process and be free from cognitive defects and impaired judgment, he was advised to report to the emergency room at Champlain Valley Psychiatric Hospital ("CVPH") for an evaluation due to his suicidal ideations and thoughts of helplessness and hopelessness.  Id.  Roat arrived at CVPH, where the medical history indicated that he had been suffering from depression and anxiety for quite some time, he had thoughts of suicide, specifically overdosing on prescription pills and alcohol, he was an alcoholic who had been drinking every day for the past twenty years, and he had difficulty sleeping and handling his aggression.  Id. at 261, 263.  Roat was given some medication samples, promptly discharged from the emergency room, and referred to Essex for follow up treatment.  Id. at 141, 292-93.

On December 14, 2004, Roat returned to Essex where a psychiatric assessment and screening was performed.  T. 139-40.  Medical staff noted Roat's long time depression and alcohol abuse, his unemployment and inability to hold a job for an appreciable amount of time, and his lack of prior mental health treatment.  T. 139. Roat's thought process was logical, he had no cognitive defects, and he was denying

6

any suicidal ideations.  Id. at 140.  Roat was referred to St. Joseph's Hospital for substance abuse services, and scheduled to continue returning to Essex to meet with a counselor for follow up therapy and medication.  Id. 140.  Also on December 14, Roat met with his treating psychiatrist, Dr. Hinsman.  Id. at 143.  Dr. Hinsman determined that Roat "ha[d] difficulty with depression and had chronic vague suicidal ideation [but] . . . no intention[s] of harming himself, has no suicidal plan and is invested in treatment and future oriented."  Id.  Roat was sober at that time, and Hinsman had given him new medication to try, which would be evaluated in two weeks. Id.

Roat was again counseled at Essex on December 23, 2004.  T. 135.  At that time, Roat possessed no evidence of a thought disorder, though he was depressed and sometimes suicidal.  Id.  Roat's appetite was noted to be good, but his sleeping habits poor.  Id.  Roat seemed to be motivated, but the motivation appeared to come from his wife's ultimatum to receive treatment and not from himself.  Id

On January 3, 2005, Roat was seen at Essex, describing himself as feeling less anxious and suicidal than he had been before.  T. 133.  Roat was still quite depressed, not sleeping well, and easily agitated.  Id.  While Roat claimed to remain sober, he had failed to follow up with St. Joseph's for substance abuse treatment.  Id.  Roat agreed to contact St. Joseph's after he left Essex though.  Id.  On January 10, Roat was seen by his primary counselor, and social worker, Molly Jacobson.  Id. at 131-32.  Roat was not experiencing side effects for his mental health medication, but also felt that it had not been overly helpful as of yet.  Id. at 131.  Roat's treatment focused on changing his behaviors and reactions, and identifying his triggers for his anger and depression.

7

Id. at 132.

On January 12, 2005, a treatment plan was designed for Roat, hoping to reduce his symptoms of anxiety and depression by having him attend counseling appointments and following up on the efficacy of his medication with a psychiatrist, taking his medications as prescribed, identifying and learning new coping strategies, and using positive thinking.  T. 130.  A few days later, Roat completed a social assessment with Jacobson whereupon he stated that he lives with his wife, but his children from a past relationship had been taken from him and he had relinquished his parental rights to said children.  Id. at 129.  Roat seemed open minded towards progressing with counseling and substance abuse therapy.  Id.  Jacobson hoped to assist Roat with managing his finances, finding him a vocational program to provide training so that he could maintain employment, and successfully completing both his outpatient therapies.  Id.

On January 19, 2005, Dr. Hinsman completed a psychiatric assessment of Roat noting that his depression had existed since childhood, his father had committed suicide, and Roat had been abused by his stepfather.  T. 125, 341.  Roat stated that his depression resulted in two suicide attempts, one as a teenager and the other while he was in his twenties, both from overdosing on prescription medications and alcohol. Id.  Roat noted no subsequent attempts and denied feeling suicidal at that time.  Id. While Roat did not presently possess suicidal ideations, he was still having difficulty with his anger and sleeping and is notably uncomfortable around a lot of people feeling like he is suffocating and needs to escape, citing that as the reason why he has had between fifty and sixty jobs as an adult.  Id at 126, 342.  Roat reported staying sober

8

for the past five weeks, and was noted to have a pleasant demeanor with intact cognitive function.  Id. at 126-27, 342-43.  Roat again denied having hallucinations and did not appear to be delusional or a danger to himself or others.  Id. at 127, 343. Roat's Global Assessment of Functioning ("GAF") score was forty-five, "primarily because of the serious impact his social anxiety has on his social and occupational functioning.  Depression per say would rate a higher score above [fifty] but nonetheless is chronic and in need of treatment."  Id.  Hinsman concluded that he would switch Roat to a different medication, provide him with a sleeping aide, and continue scheduling therapy sessions.  Id. at 128, 344.

At Roat's next appointment, on January 26, 2005, he indicated to Jacobson that he was taking his medication as prescribed and was generally feeling alright.  T. 123. On January 31, Roat complained about negative effects from his sleeping medication, which Jacobson advised that he discuss with Dr. Hinsman.  Id. at 122, 339.  On February 2, 2005, Roat met with Dr. Hinsman and indicated that he had been having no difficulty tolerating his medication, but that he also was not feeling any improvements.  Id. at 121, 338.  Roat admitted that he had used beer to fall asleep, but had not had any additional alcohol to drink after the few beers he had in his fridge were consumed.  Id.  121, 338.  Roat was depressed, but denied suicidal ideations. Id.

On February 4, 2005, Roat underwent a psychiatric evaluation with Brett Hartman.  T. 115-19.  The evaluation included a discussion about Roat's previous work history, noting that he had never been employed for more than three months and he usually quit or was terminated from employment due to his aggravation.  Id. at 115.

9

Roat had not yet been psychiatrically hospitalized, though he had undergone prior mental health evaluations.  Id.  Roat never attended mental health treatment until December 2004, confirming that his motivation to enroll came from his wife's ultimatum.  Id.  Roat was taking antidepressant medication and reported that while his drinking was a problem in the past he has "tapered off . . . and does not feel that it is a problem."  Id. at 116.  Roat also reported that he had weight fluctuations of as much as fifty pounds, he preferred to isolate himself and be away from people, and while he did not feel suicidal, he "hates people . . . ." and cannot tolerate crowds.  Id. at 116-17.

Hartman concluded that Roat had a coherent and goal directed thought process, his attention and concentration were mildly impaired, his memory skills were generally intact, he was able to follow and understand simple directions and instructions, and he possessed a fair ability to learn new tasks.  Id. at 118.  Roat had mild attention and concentration problems, mild difficulty making appropriate decisions, and a likely difficulty performing tasks that required a lot of social interaction.  Id. Hartman diagnosed Roat with major depressive disorder, dysthymic disorder, and generalized anxiety disorder, and recommended that Roat continue with intensive mental health treatment as Hartman felt he has a "guarded [prognosis] given the long term and multiple nature of [his] symptoms."  Id. at 119.

Roat's next session with Jacobson, on February 7, included a notation that Roat felt that therapy was helping his condition.  T. 120, 337.  On February 16, Roat's treatment notes with Dr. Hinsman reported Roat was feeling more confident being around other people, was feeling less depressed, and was having no side effects or issues with the medication he was recently prescribed.  Id. at 336.  However, Roat's

treatment notes from February 24 indicate that Roat perceived Dr. Hinsman as dismissive and that he had missed a previous appointment because he did not want to speak with anyone and "was upset with the 'system.'"  Id. at 335.

On February 25, 2005, Roat underwent a mental RFC assessment with Dr. Hameed.  T. 148-64.  Dr. Hameed found that Roat's abilities to (1) understand and remember instructions, (2) carry out instructions and maintain attention and concentration for long periods, (3) perform activities on a schedule, (4) sustain an ordinary routine with minimal supervision, and (5) work in coordination to others without being distracted were not significantly limited.  Id. at 148.  Roat's ability to complete a normal work day and work week without psychological interruptions was moderately limited.  Id. at 149.  Roat's social interaction skills were not significantly limited except for his moderately limited ability to accept instructions and respond to criticism from supervisors.  Id.

Additionally, Roat's ability to be aware of normal hazards, take precautions, and travel in unfamiliar places was not significantly limited although his abilities to respond to changes in the workplace and set realistic goals or make plans were moderately limited.  Id.  Roat reported that he was currently on medication and that while he had a history of heavy drinking, he now only drank a case of beer a month.  Id. at 50.  Roat's ability to communicate, understand, remember, and perform daily activities was relatively normal and Dr. Hameed concluded that Roat was not disable per any of the categories because he had no restrictions of daily living or repeated episodes of deterioration, only mild difficulties with social functioning, and only moderate difficulties with maintaining concentration.  Id. at 150, 152, 162-63.

11

On March 2, 2005, Roat returned to Essex for an appointment with Dr. Hinsman where Roat complained that his medication was making him drowsy.  T. 334.  While his mental status was unchanged, it was unclear whether that was due to the therapeutic effect of the medication, or its sedative effects, so the medication's dosage was adjusted.  Id.  A few weeks later, Roat had a session with Jacobson where he expressed frustration with the therapeutic process, threatening to cease all mental health treatments.  Id. at 332.  On April 1, 2005, Roat again met with Jacobson, explaining that he generally heard two voices, one positive and the other negative, which guided his thought process.  Id. at 330.  Roat stated that he was trying to listen to the positive voice more often, and was hoping that change would successfully occur.  Id.

However, on April 12, 2005, Roat attended his session with Jacobson stating that he felt very depressed and hopeless, he was not leaving the house or opening the shades, and his aggression had returned.  T. 329.  Dr. Hinsman prescribed Roat an increased dose of his medication, and Jacobson recommended that Roat try using the medication prior to seeking inpatient psychiatric treatment.  Id. at 328-29.  Dr. Hinsman questioned Roat thoroughly about his propensity to commit suicide, and determined that Roat was not suicidal or a suicidal risk, and recommended that if Roat's condition had not improved within ten days that he return and have his medication's dosage increased again.  Id. at 328.

Roat's condition appeared to deteriorate, as on April 22, Essex County received information from Roat's substance abuse treatment counselor at St. Joseph's that Roat was "very depressed and had an extremely negative outlook."  T. 327.  Roat

12

agreed with the assessment, though at the end of the session with Jacobson, Roat appeared to be in a better mood.  Id.  On April 27, Roat again met with Dr. Hinsman who noted that Roat was doing better after having been on his increased dose of anti depressants for the previous month.  Id. at 326.  Roat subjectively assessed his depression as a three on a scale of ten and his anxiety as a five or a six.[3]  Id. at 323, 326.

By his appointment on May 6, 2005, Roat told Jacobson that his mood had significantly improved, potentially due to his medication, or the time he was spending outdoors or assisting his wife with the housework.  T. 325.  Roat stated that he still feels that he is a failure, but is attempting to reshape the way he views himself.  Id.  On May 12, 2005, Roat had another session with Jacobson where he again felt that substance abuse treatment was a waste of his time and wished to quit going.  Id. at 324.  Throughout the session, Roat agreed to continue to have an open mind about treatment and promised to continue to attend both substance abuse and mental health sessions.  Id.  On May 18, Roat met with Dr. Hinsman and reported that his depression was still a three out of ten and his anxiety still a five or a six.  Id. at 323.  Dr. Hinsman noted a noticeable improvement in Roat's social anxiety, but stated that Roat was still symptomatic and refused to venture too far from home.  Id.  There was also another discussion about increasing Roat's medication doseage.  Id.

Despite this seemingly positive progress, on May 19, 2005, Roat was admitted

---

[3] Roat's mental health records indicate that he initially told Dr. Hinsman that his depression rated a seven out of ten.  T. 326.  However, at a subsequent appointment it was established that Roat had misunderstood the scale and that his true feelings were that his depression ranked a three out of ten.  Id. at 323.

for psychiatric hospitalization after he told his counselor at St. Joseph's that he had homicidal thoughts of smothering his wife to death with a pillow and then killing himself by taking an overdose of his prescription medication.  T. 176, 190-93, 201, 219, 264, 266, 322.  After telling his counselor at St. Joseph's, the counselor contacted Jacobson who spoke with Roat and Roat confirmed his previous statements, reported he had only had four or five good days in the last month, admitted to only telling his counselors at St. Joseph's and Essex information which he thought they wanted to hear instead of what he was actually experiencing, and acted as though he wanted to go to CVPH now because he had a true interest in receiving appropriate care.  Id. at 322.  Admission papers indicated that the extent of Roat's present drinking was unclear as he stated that he had been sober for seventeen years, but also reported that he only drinks occasionally, and later stated he had consumed a six pack two weeks earlier.  Id. at 191, 208, 219.  Additionally, Roat reported to hearing voices, but it was unclear whether these voices were his own thoughts or from another source.  Id. at 201.  Upon admission to CVPH, Roat was alert and cooperative, had an appropriate affect and speech patterns, denied any suicidal or homicidal ideations, appeared to have his cognition grossly intact, and showed no signs of distress.  Id. at 192.  Roat reported that he still had trouble sleeping, felt agitated, and thought that his medication was not working.  Id. at 201.

Roat was diagnosed with chronic depression and social anxiety disorder.  T. 192.  Roat's history established that he had threatened suicide before, specifically in December 2004, but had never made a suicide attempt, was vague in his threats, and also not lethal.  Id. at 203.  Conversely, on this day Roat's suicidal threats were

14

specific, since he counted out pills at home in preparation for an overdose, and caused concern.  Id. at 203-204.  After admission, Roat denied wanting to hurt his wife, but was hesitant in denying that he still did not want to harm himself.  Id. at 208, 219.

Including his date of admission, Roat was hospitalized at CVPH for six days.  T. 201-32.  On the second day, Roat denied suicidal ideations, ranked his depression as a four out of ten, and participated successfully in half of his group therapy activities for the day.  Id. at 218-19, 242-44.  The third day, Roat was again pleasant and calm, expressing no suicidal or homicidal ideations and again successfully participated in half his group activities.  Id. at 216-17, 222-23, 240-41.  Roat also met with his family and counselors from Essex and disclosed that he had not been honest with Dr. Hinsman about his condition.  Id. at 217.  Roat admitted to never leaving the house for five months and taking his medications inconsistently, only about half of the time Dr. Hinsman had recommended, because Roat had been frustrated with all the medication and doseage changes.  Id. at 216-17, 222.

On the fourth day, Roat expressed understanding of the importance of remaining on his prescribed medication and continued outpatient mental health and substance abuse treatment and participated successfully in the majority of his group therapy activities.  Id. at 216, 238-39.  Roat also stated that his depression was a two out of ten, he had no suicidal or homicidal ideations, he felt ready to go home, and he had learned valuable skills about coping with stress like deep breathing and maintaining structure in his schedule.  Id. at 215.

By the fifth day, Roat stated that his depression was feeling much better, he again denied suicidal and homicidal ideations, was taking his medication on a regular

basis, and was socially interacting with other patients.  T. 214-15, 226-27.  On the sixth

day, Roat was discharged from CVPH.  Id. at 180-84, 212-13, 228-29.  Upon

discharge, (1) Roat was taking his medications regularly, (2) had become successfully

able to address his social anxiety through interactions in group therapy where he

learned that he could be comfortable around people in structured circumstances, (3)

showed a marked increase in his attention to his physical health, relationships with

family, functioning at work and home, knowledge of his diagnosis and medications,

ability to be helpful with others and recognition of other's boundaries, and (4) showed

slight improvements in his use of community resources, communication of needs and

ability to carry on a meaningful conversation.  Id. at 180, 212-13.

On May 27, 2005, a few days after he was discharged from CVPH, Roat

returned to Essex for a session with Jacobson.  T. 231.  Roat stated that he felt that he

received a tremendous amount out of his hospitalization as he went to group therapy

and met people who he liked and also learned that taking his medications consistently

was essential.  Id.  Roat also expressed an interest in case management, seeking to

get assistance with completing his GED, and receiving job training, transportation and

assistance socializing.  Id.  Roat returned for another session with Jacobson on June

6, stating that he felt better but was less enthusiastic than last week because he had

begun to have good and bad days again and was feeling embarrassed that he was

unable to work due to mental health reasons.  Id. at 320.

On June 16, 2005, Roat met with Dr. Hinsman, and Roat reported that he

continued to do well, his depression was noticeably reduced, he has no suicidal

ideations, and his depression was rated about a four out of ten.  T. 319.  Additionally,

Roat did not complain about anxiety resulting from social situations, although Roat had not challenged himself in this regard either.  Id.  On June 23, Roat met with Jacobson expressing concern that, after six months of therapy, he had failed to see any remarkable changes in his mood or behavior.  Id. at 318.  On June 29, Jacobson met with Roat again and noted that he had been discharged from his substance abuse program at St. Joseph's and commented that he had "improved his coping skills . . . and c[ould] identify and challenge his negative thoughts . . . ."  Id. at 317.

On June 30, 2005, Dr. Hinsman noted that Roat continued to have difficulty with social anxiety, his depression was a four or five out of ten, and he still felt trapped at home though  ventured out with his wife occasionally.  T. 316.  Although Roat was tolerating his medication well, Roat still felt that he was incapable of working due to his social anxiety.  Id.  Dr. Hinsman noted that despite Roat's lack of suicidal ideations, he still remained depressed.  Id.  On July 7, Jacobson noted that Roat was negative, reported that things in his life were the same, and had little hope that things were going to change.  Id. at 315.  However, by the end of the session, Jacobson noted that Roat was smiling and laughing.  Id.

On July 15, 2005, Roat reported to Jacobson that he was trying to do things differently in his life, specifically going on walks with his wife and speaking with his elderly neighbor.  T. 313.  However, Roat could still not go grocery shopping because crowds of people still made him angry.  Id.  On July 21, Roat stated that he was feeling good overall and that he had a good week.  Id. at 310.  That same day, Roat also met with Dr. Hinsman, who lowered the dosage of Roat's medications because his condition seemed to be improving due to Roat's claims that he was more comfortable

around people and in social situations.  Id. at 311.  On July 29, 2005, Jacobson noted

even further improvement in Roat's condition as he reported that he bought a car, was

learning to control his bad moods by exercising, had been productive around his house

and felt good, and was tolerating people well and having positive interactions with

others. Id. at 309.  Roat stated that he had taken his medication consistently, but had

also cut down on his medication dosages, without the consent and advice of Dr.

Hinsman.  Id.

On August 8, 2005, Roat reported to Jacobson that he had successfully taken

the first half of his GED examination for which he was very proud and excited.  T. 308.

Roat also enthusiastically reported that he spent the weekend at his friend's house at a

large party where he reconnected with a lot of old friends who were surprisingly

supportive of his current situation.  Id.  Roat found himself gravitating towards those

individuals who drank less and did not smoke marijuana.  Id.  This left Roat feeling

more optimistic of developing positive relationships with people.  Id.

However, by August 26, 2005, Roat was expressing a lot of frustration with his

case management and housing arrangements and wanted to discontinue his

medication immediately.  T. 307.  Roat was motivated to begin working again and had

successfully attained his GED, but was still struggling with getting himself out of the

house to do outdoor activities.  Id.  On August 31, 2005, Roat met with Dr. Hinsman

about his requests to cease taking medication.  Id. at 306.  Roat continued to do well,

being free from symptoms, reported a better relationship with his wife, stated that he

was socializing some, and concluded that he was pleased with the progress he had

been making.  Id.

On September 7, 2005, Roat expressed anxiousness to Jacobson about the life that he is trying to create.  T. 305.  Overall though, Roat stated that his relationships were improving, he was increasing his level of honesty and respect for others, and he was feeling more confident and hopeful overall.  Id.  Roat's situation seemingly continued to improve.  On September 23, 2005, Roat told Jacobson that things were going great, he had a job interview at a nursing home, he was terminating relationships with people who were toxic to him, and he was weaning himself off his medication pursuant to Dr. Hinsman's recommendations.  Id. at 304.

On December 12, 2005, Roat was discharged from treatment at Essex because his "anxiety and depression have decreased as evidenced by successful engagement in . . . outpatient [substance abuse] treatment, compliance with medical, development of coping skills and increased awareness of thoughts, feelings and behaviors."  T. 138.  A treatment note from a few days later shows that Roat had discontinued taking psychotropic medication many months earlier, he was successfully working at the nursing home, he was comfortable in social situations as evidenced by the holiday party he was attending that night, and he was requesting to be released from treatment.  Id. at 303.

On April 19, 2005, Jacobson completed a functional assessment of Roat.  T. 295-301.  Jacobson noted that  Roat had no onset of psychotic features or deterioration from a previous level of functioning, and that there were no documented persistent delusions, hallucinations, or disorganized behavior, though he was emotionally withdrawn and isolated.  Id. at 296.  Roat had an affective disorder, caused by depressive symptoms including loss of interest in activities, sleep

disturbances, decreased energy, feelings of worthlessness, difficulty concentrating and thinking, thoughts of suicide, and paranoid thinking.  Id. at 297.  Roat also demonstrated symptoms of anxiety as his symptoms were deeply ingrained and there were maladaptive patterns of behavior including pathologically inappropriate suspiciousness, hostility, persistent mood disturbances, and intense and unstable interpersonal relationships.  Id. at 298.

Jacobson concluded that Roat had marked restrictions in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace due to his depressive and anxiety ailments.  Id. at 299.  Jacobson also concluded that Roat had difficulty completing tasks in a timely fashion and has had four or more documented episodes of decompensation, each of which was for an extended duration.  Id.  Roat also had a substantial loss of ability to maintain his concentration for an extended period of time, perform activities within a schedule, be punctual, maintain regular attention for two hour segments, work in coordination with others, get along with coworkers and peers, and accept instructions and respond appropriately to criticism.  Id. at 300.

Roat was diagnosed with having major depressive disorder and social anxiety disorder.  T. 300.  Roat's history noted a depressive episode from November 2004 until September 2005, partial remission until about February 2006, and now currently in a depressive episode again.  Id. at 301.  Roat has been suffering from these depressive episodes since on or before December 2004 and such depression was severe enough, at the time, to prevent Roat from working full time.  Id.

On May 17, 2006, Dr. Hinsman also completed a functional assessment of

Roat.[4]  T. 347-352.  Dr. Hinsman noted that Roat had no delusions, hallucinations, catonic behavior, incoherence, illogical thinking or poor speech; but, did note Roat was emotionally withdrawn and isolated.  Id. at 347.  Dr. Hinsman concluded, due to Roat's confession that he had not been fully candid with the Essex staff and had discontinued his medication, that "it is difficult[] for [him] to know how valid [Roat's] statements ever were and all history regarding his illness, level of functioning, response to treatment, etc. will have to be re-gathered and re-assessed."  Id. at 352.

On December 10, 2006, Roat was again taken to the CVPH for communicating "vague thoughts of suicidal ideations with a plan to overdose."  T. 105, 194.  Roat admitted to having vague suicidal tendencies, but stated that he would never actually attempt to commit suicide.  Id.  Roat admitted to drinking beer and whiskey every day, using the alcohol and his prescription medication as sleep aides, and having weekly episodes of considering suicide.  Id. at 107-108, 196-97.  While Roat has no history of suicidal notes or plans, he says that he wants to hurt himself because the conditions in his life are generally poor.  Id. at 109, 198.  Roat was again diagnosed with depression, with a GAF score of sixty.  Id. at 111, 200.  Roat was ultimately discharged home with instructions to return to Essex for additional mental health counseling and treatment.  Id.

---

[4] Roat's assessment was submitted subsequent to the administrative hearing, but the ALJ was given notice of the late submission at the hearing and the ALJ determined that the submission would still be timely and considered prior to deciding Roat's benefits.  T. 359.

### 3. Administrative Hearing Testimony and Decision

Roat stands 6' 2" and weighing 305 pounds.  T. 362.  Roat received his GED in

August 2006 and most recently worked as a certified nurse's aide in Lake Placid from

October 2005 until February 2006.  Id. at 363-64.  As a nurse's aide, Roat worked the

night shift and assisted people to the restroom, answered call lights, and  made the

residents' beds.  Id. at 365.  Roat left the position because he was unable to deal with

the residents' needs and he fought with his supervisor.  Id.  Other than that, the

longest job which Roat held was in 2000 or 2001, when he worked for a water

company in Saratoga, cleaning the water coolers, fixing the coffee machines, counting

inventory, and cleaning the warehouse.  Id. at 367.  Roat enjoyed that position, but

began to feel uncomfortable with work after the company changed management and

instituted new policies and was eventually terminated when he got into an accident

with the company car.  Id. at 368, 377.  However, if a similar opportunity arose with

policies identical to those under which Roat was initially hired, he did not see why he

could not work in such a place.  Id.

Roat has been admitted to CVPH twice, and as of the time of the hearing, was

still in treatment but not currently on any medications.  T. 370-74.  Roat stated that the

medications helped but not enough to keep him from getting frustrated with their

efficacy.  Id. at 374.  This is the same reason why Roat threw away his medication in

the fall of 2005 when he was under the care of Dr. Hinsman, because he was

continually frustrated with constantly changing the medications and their dosages and

never feeling like anything was actually working.  Id. at 381.  Roat's daily activities

included helping with house chores, driving his wife to the store, and going to medical

22

appointments.  Id. at 375.  Roat enjoyed outdoor activities but did not participate in any

social or religious events.  Id.  Roat stated that he was sober.  Id.  Roat also testified

that his condition had worsened since 2000 when he was working at the water

company.  Id.

A vocational expert, Mr. Manzi, also testified at the hearing.  T. 382-99.  Manzi

evaluated positions which were available to individuals thirty-five to thirty-eight years of

age, with a high school or equivalent education, who were able to perform the full

range of unskilled labor tasks but could only have minimal contact with co-workers,

supervisors and the general public.  Id. at 390.  Based on this hypothetical, Manzi

stated that this individual could do the same past relevant work that Roat had

performed at the water plant.  Id. at 391.  Such work was acceptable in both specific

terms, relating to Roat's previous employment, and general terms, as those job duties

were characteristic of those generally performed by those employed as an industrial

cleaner.  Id.  Both work requires minimal contact with others because the cleaning and

working assignments are individualized and focus on getting that individual work done.

Id.

ALJ Farrell denied Roat's request for social security benefits.  T. 8-17.  ALJ

Farrell concluded that Roat had "mild limitations in activities of daily living, moderate

limitations maintaining social functioning, and moderate limitations in concentration,

persistence and pace.  The record provides evidence that the claimant has had only

one or two episodes of deterioration or decompensation."  Id. at 13.  Additionally,

Roat's daily activities of reading, watching television, playing cards with his wife,

entertaining his mother and in-laws for dinner, and limited participation in outdoor

activities supports a classification of mild limitations.  Id.  The fact that Roat did not

seek any mental health treatment until December 2004 and that he had a contributing

substance abuse problem also supports the lack of a marked limitation on Roat's

functioning and maintaining concentration, persistence and pace.  Id. at 14.

Additionally, in February 2005 when Roat saw the consultative examiner, he

confirmed that he was only recently involved in mental health treatment due to an

ultimatum from his wife.  Id.  Before December 2004, Roat had never been

psychiatrically hospitalized or received regular or ongoing treatment.  Id.  The ALJ

noted that Roat complained that his depression had been present throughout most of

his life, but found that in April 2005 Roat was improving on psychiatric medication and

that he declined and required hospitalization when he decided, unbeknown to Dr.

Hinsman and Jacobson,  to no longer take his medication as prescribed.  Id.  Roat

again improved during the hospitalization, while he was actively participating in therapy

and taking medication as prescribed, and was discharged shortly after admission.  Id.

Roat was comfortable around others in a structured environment, passed his GED

examination, attended a large party and spent time with people in crowds, and was

generally feeling well.  Id. at 14-15.

Roat ceased regular treatment in December 2005, and was then rehospitalized

in May 2006.  Id. at 15.  Roat's GEF scores were forty five, but probably would rate

higher when taking into consideration his depression.  T. 15.  Additionally, Roat's

mental health evaluation in February 2005 indicated that he could follow and

understand simple directions and learn new tasks, was only limited by mild attention,

concentration, and decision making problems, and was more significantly limited with

24

his ability to interact with others.  Id.  The ALJ accorded this assessment great weight because it was supported by the record.  Id.  Similarly, the state agency's medical examiner's assessment was also given great weight as it concluded that Roat still "retained the ability to perform work activity."  Id.

The ALJ attributed little weight to the assessments of Jacobson and Dr. Hinsman.  T. 15.  With regard to Jacobson, the ALJ stated that the "assessment of [Roat's] functioning are grossly unsupported by the record, and her exaggerated assessments in those areas significantly detract from the credibility of her overall assessments."  Id.  Additionally, the ALJ did not find that the medical evidence or Roat's testimony supported Jacobson's assessments that Roat had marked restrictions in his functioning ability.  Id.  There were (1) specific contradictions regarding whether Roat was hospitalized, (2) evidence in the record regarding the successful completion of Roat's GED, (3) medical evidence that Roat responded well to group therapy, and (4) Roat's admission that he was dishonest with Dr. Hinsman and Jacobson about taking his medication, making it difficult for either of them to truly assess "his history, functioning, and response to treatment."  Id. at 16.

The ALJ also considered Roat's testimony and determined that he was not totally credible based upon multiple inconsistencies.  First, despite Roat's claims of major depression and disability, he often reported to Dr. Hinsman and Jacobson that he was doing well, he was employed as a certified nurse's aide, he successfully completed his GED examination, and his GAF scores in 2005 indicated that he was only mildly affected with difficulties in social functioning but doing well overall.  T. 16.  Additionally, Roat's testimony is inconsistent with other facts in the record about his

25

reasoning for why and when he ceased taking the medication and how many jobs he had maintained for more than three months, "add[ing] question to [Roat's] allegations of being unable totally . . . to function." Id.  Furthermore, when the ALJ asked why Roat could not be employed again in a substantially similar work environment as the one he was employed at for being an industrial cleaner, Roat stated that "he did not know why he would not be able to do that type of work again." Id. at 16-17.  Based on this response and the testimony of the vocational expert, to whom the ALJ gave great weight, the ALJ concluded that Roat was capable of performing his past relevant work specifically, and also that same position in general employment terms, which is referred to as an industrial cleaner. Id. at 16-17.

### 4. New Evidence of Mental Health Treatment[5]

On November 6, 2006, Roat was admitted to CVPH again for having suicidal and homicidal thoughts. T. 405.  Roat was hospitalized for five days and discharged with no feelings of depression or suicidal or homicidal  ideations, and given a diagnosis of Bipolar Disorder. Id. at 405406.  While hospitalized, Roat was placed on different medication and told to continue receiving mental health care from Essex. Id. at 406.

On April 5, 2007, Roat attended a session with Dr. Hinsman where he appeared depressed, but not suicidal. T. 399.  During the session, Roat conceded that his depression might be due to his denial of disability. Id.  Dr. Hinsman comments that

---

[5] The new evidence being considered is located in Roat's Memorandum of Law (Dkt. No. 9-1), and is specifically paginated in sequence with the administrative hearing transcript and record.  Thus, citations to the new evidence will also follow the transcript format.  See *supra* n.1.

Roat's "earlier confession . . . that he had not been candid with [him] was not necessarily regarded as a negative issue in [his] treatment of the patient . . . The reality is that many patients unfortunately are not candid with their physicians . . . [which] should not be held against [Roat] in terms of any disability determinations."  Id.  Dr. Hinsman adjusted Roat's medication and also noted that Roat had "bipolar issues" which weighed heavily against using antidepressant medications.  Id. at 400.

On May 3, 2007, Dr. Hinsman wrote a clarification letter and attached a new functional capacity assessment.  T. 401-04.  Dr. Hinsman indicated that Roat is diagnosed with Bipolar Disorder, and was in a depressed episode with another diagnosis of social anxiety. Id. at 401.  Dr. Hinsman concluded that Roat's present

> symptoms severely interfere with his ability to work.  He has difficulty concentrating thus his ability to remember instructions, details or carry them out in a consistent or time manner is moderately to markedly impaired.  His mood is depressed and irritable.  His symptoms interfere with his ability to be consistent and reliable in the work setting . . . There are also moderate to severe stressors in his life that contribute to the worsening of his symptoms and thus his ability to engage in gainful employment at present.

Id.  This was confirmed in his RFC assessment where Dr. Hinsman noted moderate limitations in the ability to remember locations, work procedures, understand and remember short and simple instructions, and make simple work-related decisions.  Id. at 402.  Roat experienced marked limitations in the ability to understand and remember detailed instructions, carry out short and detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and be punctual, sustain an ordinary routine without special supervision, and work in coordination and proximity to others without being distracted.  Id.  Dr. Hinsman also

noted marked limitations in the ability to complete a normal workday and week without psychologically based interruptions, interact appropriately with the general public, ask simple questions or ask for assistance, accept instruction and respond to criticism appropriately, get along with coworkers without distracting them, maintain socially appropriate behavior, respond appropriately to a changed work setting, and set realistic goals or make plans.  Id. at 403.  Additionally, Roat was also moderately limited in his ability to be aware of normal hazards and take precautions and travel in unfamiliar places.  Id.

### B. New Evidence Standard

Pursuant to 42 U.S.C. § 405(g), "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ."  See also Lisa v. Sec'y Dep't of HHS, 940 F.2d 40, 43 (2d Cir. 1991).  The Second Circuit has developed a three part test for new evidence, allowing supplementation of the record where evidence was "(1) 'new' and not merely cumulative of what is already in the record, . . . (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative . . ., [and (3) where there was] good cause for [claimant's] failure to present the evidence earlier."  Id. (internal citations omitted).

In this case, the new evidence which Roat proffered complies with the new evidence standard and should be admitted.  First, the evidence is new.  The evidence

includes provider notes from a subsequent hospitalization which led to a different diagnosis for Roat's mental health conditions, specifically a more severe diagnosis of Bipolar Disorder.  T. 405-06.  The new evidence is also comprised of follow up treatment notes with Essex after the hospitalization, a letter of clarification from Dr. Hinsman on his relationship and impressions of Roat, and an amended RFC assessment.  This new diagnosis requires that his condition, its severity, and its impact on his previous and subsequent ability to work be reassessed.  See Tolany v. Heckler, 756 F.2d 268, 272 (2d Cir.  1985) (holding that where "a treating physician has for the first time diagnosed a neurological cause . . . [for a] serious condition, which had previously been assessed and treated only as a urological impairment," constituted new evidence which required reassessment under the Grids).

Dr. Hinsman's reassessment of Roat's functional capacity was also included with the newly proffered information.  T. 402-03.  Because "[b]ipolar depression, like other forms of depression, is diagnosed based mainly upon the subjective reports of the patient," Dr. Hinsman's interviews and interpretations which were unavailable before, given the prior misdiagnosis of depression and Roat's lack of a candid statements during treatment to evaluate his history and progress, and are now essential to proper evaluation of Roat's claim.  See Kinser v. Plans Admin. Comm. of Citigroup, Inc., 488 F. Supp. 2d 1369, 1375 (M.D.Ga. 2007) (explaining subjective testimony from the affected individual as the best basis upon which to diagnose and evaluate those suffering from mental health afflictions).

Moreover, the subsequent hospitalization and treatment notes contemplating a new diagnosis are also material to the current disability claim.  The treatment notes

discuss Roat's previous sessions with Essex staff where he failed to be completely candid and further clarified what symptoms and limitations result from bipolar disorders.  T. 399-402.  This discussion is material because "a diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment."  Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981) (internal quotation marks and citations omitted).  "Because of its complexity, bipolar disease can be difficult to diagnose; between seven and ten years of misdiagnoses and incorrect treatment is typical for bipolar patients."  In re Zyprexa Prods. Liability Lit'n, 253 F.R.D. 69, 98 (E.D.N.Y. 2008).  Remand based on new evidence, specifically a new diagnosis of bipolar disorder following a hospitalization a year after the hearing concluded, deemed appropriate.  Brehm v. Astrue, No. 09-CV-263T-30TGW, 2009 WL 4041826, at *2 (M.D.Fla Nov. 20, 2009).

Thus, even though Roat's bipolar diagnosis was determined after the hearing was concluded, the symptoms and depression for which he was treated during the relevant time period may have actually been misdiagnosed due to his lack of candidacy.  Such mistrust and failure to be completely transparent in therapy is common for those suffering from bipolar disorder.  See Reals v. Astrue, No. 08-CV-3063, 2010 WL 654337, at *2 (W.D. Ark. Feb. 19, 2010) ("According to the DSM, patients suffering from . . . bipolar disorder also suffer from . . . poor insight . . . predispos[ing] the individual to noncompliance with treatment . . . ."); see also Bauer v. Astrue, 532 F.3d 606, 607 (7th Cir. 2008) (discussing the availability of treatment for bipolar disorder but concluding that "many patients do not respond well to treatment, or have frequent relapses.") (citations omitted).

Lastly, there was good cause for failing to disclose the information earlier because the diagnosis was not arrived at until after another involuntary hospitalization and further observation which occurred after the hearing date.  Just because the hospitalization and diagnosis occurred later, does not mean they do not fall within the good cause exception.  See Tolany v. Heckler, 756 F.2d 268, 272 (2d Cir. 1985) (finding good cause where "the doctor's diagnosis was based on a recent neurological evaluation and laboratory data [acquired after the administrative hearing], and his assessment of [claimant's] response to medication necessarily had to await some period of observation.") (citations omitted).

Accordingly, the new evidence offered by Roat satisfies the elements outlined in § 405(g) and should be considered on remand.


## B. Severity

Roat contends that the ALJ failed properly to assess the severity of his mental health conditions.  Additionally, Roat contends that the ALJ completely failed to assess the severity of his obesity.

With regard to Roat's mental health limitations, as noted, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities.  See subsection IV(A) supra; 20 C.F.R. § 404.1521(a) (2003).  An impairment, or combination thereof, is not severe if it does not impinge on one's "abilities and aptitudes necessary to do most jobs." Id. § 404.1521.  Basic work

activities which are relevant for evaluating the severity of a physical impairment include

"physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching,

carrying, or handling. . . ."  Id. § 404.1521(b)(1).

        "The Social Security regulations list certain impairments, any of which is

sufficient, at step three, to create an irrebuttable presumption of disability."  DeChirico,

134 F.3d at 1180; see also 20 C.F.R. § 404.1520(d) (2003); Id. at pt. 404, subpt. P.

App. 1 (2003)(listing of per se disabling ailments).  Additionally, the regulations state

that "if an individual has an impairment that is 'equal to' a listed impairment," that

individual is disabled regardless of his or her age, education, or work experience.

DeChirico, 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

        Roat's mental health was evaluated pursuant to listings 12.04 and 12.06.  T. 13.

Section 12.04 outlines the requirements for disability pursuant to an affective disorder,

those conditions "[c]haracterized by a disturbance of mood, accompanied by a full or

partial manic or depressive syndrome."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.[6]

In order to have an affective disorder, one must have either a medically documented,

persistent depressive syndrome, manic syndrome, or "bipolar syndrome with a history

of episodic periods manifested by the full symptomatic picture of both manic and

depressive syndromes . . . " and have at least two additional symptoms demonstrated

by either marked restrictions in either activities or daily living, social functioning, or

maintaining concentration, persistence or pace or repeated episodes of

---

        [6] Bipolar disorder is defined as a "mood disorder[] in which both manic and
depressive episodes occur."  Dorland's Illustrated Medical Dictionary 201 (28th ed.
1994) [hereinafter "Dorland's"].

decompensation for extended durations.  Id.  If an individual cannot prove a persistent

symptom and marked restrictions or decompensation, an individual can still have a per

se affective disorder disability by showing a "[m]edically documented history of a

chronic affective disorder of a least [two] years' duration that has caused more than a

minimal limitation of ability to do basic work activities, with symptoms or signs . . . ." of

repeated episodes of extended decompensation, a disease process resulting in an

individual that was unable to adapt to any increase in demands or change in

environment, or an inability to function inside society for more than a year without a

"highly supportive living arrangement."  Id.

Additionally, Roat was evaluated pursuant to Section 12.06 which evaluates

anxiety related disorders.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.  In order to

have a per se anxiety disorder, an individual must have a medically documented

finding of either (1) persistent anxiety or persistent irrational fears, (2) recurrent severe

panic attacks, (3) recurrent obsessions or compulsions, or (4) recurrent recollections of

traumatic experiences and suffer from two additional symptoms demonstrated by

marked restrictions in either activities or daily living, social functioning, or maintaining

concentration, persistence or pace or repeated episodes of decompensation for

extended durations.  Id.  The other way in which a per se anxiety disorder is

categorized is by a complete inability to function outside of one's home.  Id.

Based upon Roat's state medical examinations, it was determined that he had

only mild and moderate limitations in his activities of daily living, social functioning, and

concentration.  T. 13-14.  Additionally, Roat only had two hospitalizations, in May 2005

and May 2006, which was deemed insufficient to qualify as repeated episodes of

extended decomposition.  T. 13.  The ALJ also pointed to Roat's success in group therapy during his hospitalization, varied work history, activities done at home, family relationships, hosting family dinner parties, obtainment of his GED, and attendance at a holiday party as evidence of Roat's mild daily and social limitations.  T.13-15.  This appears to indicate substantial evidence in the record to conclude that Roat cannot establish a disability per se, but further examination reveals that the ALJ failed to discuss the periods of decompensation and regression which flanked the periods of improvement noted above.

Despite the subjective comments that Roat provided during the Essex therapy sessions, the medical record shows a hospitalization in May 2006 and another crisis evaluation in December 2006 where professionals characterized Roat as suicidal.  T. 105-14, 173-79, 180-84, 190-93, 201-44.  This lack of discussion calls into question whether the decision was actually based on substantial evidence.  Schmidt v. Astrue, No. 07-CV-65, 2008 WL 1774381, at * 12 (N.D.Ind. Apr. 15, 2008) (concluding that "although the ALJ need not discuss every piece of evidence . . . the ALJ may not ignore an entire line of evidence that is contrary to the ruling, [o]therwise it is impossible for the reviewing court to tell whether the ALJ's decision rests upon substantial evidence.") (internal question marks and citations omitted).

Additionally, as discussed infra, the inability to receive information from Roat's treating physician and counselor[7] as to his actual limitations on social functioning and

---

[7] Though not a medical source, Jacobson's treatment notes represent "evidence from other sources to show the severity of [Roat's] impairment and how it affects [his] ability to work."  20 C.F.R. §404.1513(d)(1).

concentration represent a gap in the record.  This gap is critical, especially with respect to the 12.04 analysis, because it appears uncontroverted that Roat had persistent medically documented depressive symptoms.  Thus, if the additional medical evidence supplied indicates that Roat also had a bipolar syndrome and that syndrome increased his limitations from mild and moderate to marked, or that his additional hospitalization represented an extended and repeated episode of decompensation, Roat will qualify as having a per se mental health disability.  Accordingly, the ALJ's decision should be remanded for further consideration given the additional medical evidence and failure of the ALJ to discuss the severity argument in light of Roat's periods of decline.

Additionally, Roat contends that the ALJ did not properly classify and consider his obesity claims.  In order to receive a ruling granting disability benefits, petitioner must "prove . . . that [he is] disabled . . . [by] bring[ing] to [the Commissioner's] attention everything that shows that [petitioner is] . . . disabled." 20 C.F.R. §404.1512(a).  Specifically, petitioner must "furnish medical and other evidence [and] . . . its effect on [claimant's] ability to work on a sustained basis."  Id.  In this case, Roat did not offer any medical evidence that he was disabled due to obesity.  Roat did not include obesity in his petition and it was not a topic which was ever discussed during his mental health treatment sessions.  T. 71.  Moreover, to the extent that Roat did discuss his obesity, he indicated in his psychiatric evaluation with Hartman that his eating habits were inconsistent and were characterized by bouts of loss of appetite or binge eating which resulted in "his weight fluctuat[ing] up and down [fifty pounds]."  T. 116.  Thus, this indicates that the medical condition was transient, at best.  Moreover, the condition, even if it did exist, was not shown to effect Roat's ability to work.

35

Without such a showing, disability benefits are inappropriate to award.  See

generally Rivera v. Harris, 623 F.2d 212, 215-16 (2d Cir. 1980) (citations omitted).

Accordingly, Roat's weight or obesity as a severe impairment should not be

considered.

### C. Treating Physician Rule

Roat contends that the ALJ improperly credited the opinions of the state

examiners and did not request information from his treating physician to fill the gaps in

the record.  Additionally, Roat claims that the ALJ did not give proper deference to his

treating therapists.

When evaluating a claim seeking disability benefits, factors to be considered

include objective medical facts, clinical findings, the treating physician's diagnoses,

subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret.

Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating

source.  Under the regulations, a treating source's opinion is entitled to controlling

weight if well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is inconsistent with other substantial evidence in the record.  20 C.F.R.

§ 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  Before a treating physician's opinion

can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d

496, 505 (2d Cir. 1998).

In this case, the ALJ rejected Roat's treating physician and counselor[8] based on

---

[8] Jacobson, "[a]s a clinical social worker . . . [wa]s not an 'acceptable medical
source' for purposes of establishing an impairment.  However, her opinion may be

Roat's lack of honesty with the Essex staff which resulted in an unreliable body of evidence from which to make a conclusion or RFC statement.  T.15-16.  Dr. Hinsman indicated that Roat's dishonesty made it "difficult[] . . . to know how valid [Roat's] statements ever were and all history regarding his illness, level of functioning, response to treatment, etc. will have to be re-gathered and re-assessed."  T. 352.  As discussed above, the additional medical evidence serves as a basis for the reassessment of Roat's conditions.

Given that information, "the remedial intent of the Social Security statute, and the non-adversarial nature of benefits proceedings, the ALJ had an affirmative duty, even if claimant was represented by counsel, to develop the medical record if it was incomplete."  Hopper v. Comm. of Social Security, No. 96-CV-38 (LEK/DRH), 2008 WL 724228, at *11 (N.D.N.Y. March 17, 2008) (citations omitted).  Defendant argues that Dr. Hinsman's initial RFC did not qualify as identifying a gap in the records which required any sort of additional inquiry.  However, "'the medical record paints an incomplete picture of [Roat's] overall health during the relevant period, [as] it includes evidence of problems . . . [thus] the ALJ had an affirmative duty to supplement [the] medical record, to the extent it was incomplete, before rejecting [Roat's] petition . . . ."  Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005).  Therefore, the ALJ should have communicated with Dr. Hinsman prior to relying solely on the state's medical assessments and regarding the rest of Roat's medical treatment records and testimony

---

considered to show the severity of an impairment and how it affects [Roat's] ability to do work."  Leinsten v. Astrue, No. 08-CV-6556, 2010 WL 1133246, at *5 n. 4 (W.D.N.Y. March 23, 2010) (citing 20 C.F.R. §404.1513(a), (d)(1)).

as inconsistent and unreliable.

This case is distinguishable from others where, quite simply, treating opinions were never offered.  Here, Roat presented evidence indicating that further inquiry was required.  See Hall v. Astrue, No. 08-CV-2002, 2009 WL 426539, at *4 (E.D. Ark. Feb. 20, 2009) ("If more information was needed from [the] treating and examining physicians . . . it was [Roat's] burden to introduce that evidence.").  As Roat provided this information and argument, the ALJ was incorrect in failing to further pursue it.

Accordingly, the Commissioner's decision in this regard should remanded for reevaluation in light of the new evidence for the medical record.


### D.  Credibility

Roat contends that the ALJ's decision to discredit his testimony was in error. The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003). This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529 (2003).  "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'"  Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at

38

*10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms and the extent to which these symptoms are consistent with the medical and other evidence. 20 C.F.R. § 404.1529 (2003). This is a two-step analysis whereby the ALJ "first determin[es] whether the claimant has medically determinable impairments which could reasonably be expected to produce the pain or other symptoms alleged," and then whether in light of those impairments, "the intensity and persistence of the symptoms . . . limit the claimant's capacity to work." Duell v. Astrue, No. 08-CV-969, 2010 WL 87298, at *4 *(N.D.N.Y. Jan. 5, 2010) (internal quotation marks and citations omitted). Such symptoms are "reasonably . . . accepted as consistent with the objective medical evidence and other [findings]." 20 C.F.R. §404.1529(a). However subjective complaints of a claimant's restrictions "will not [be] reject[ed] . . . solely because the available objective medical evidence does not substantiate [the claimant's] statements." Id. §404.1529(c)(2).

In the event there is "conflicting evidence about a [claimant's restrictions], the ALJ must make credibility findings." Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983)). The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged restrictions and the degree to which they hamper the applicant's ability to engage in substantial gainful employment. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

      (i)  [The claimant's] daily activities;

      (ii)  The location, duration, frequency, and intensity of [the

claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that Roat's allegations of disabling symptoms were not credible because (1) the totality of the medical evidence contradicted Roat's self-defined limitations, (2) Roat was not candid with his treatment team at Essex, (3) Roat made inconsistent statements throughout his treatment, and (4) Roat was not compliant with his medication regime.

Roat's medical evidence shows a pattern of improvement and then decline. The ALJ focuses primarily on the recent period of improvement, following his May 2005 hospitalization, characterized by passing the GED exam, working at a nursing home, functioning well in group therapy, socializing with friends at a large gathering, and maintaining his activities of daily living.  T.  16.  However, the ALJ failed to discuss the periods of decline, specifically the two subsequent periods where suicidal ideations were identified, first in a hospitalization in May 2006 and second in a crisis evaluation

in December 2006.  T. 105-14, 173-79, 190-93, 201-44.  Thus, the ALJ only talked

about a portion of the evidence regarding Roat's daily activities.  Failing to discuss

these periods of decline is another reason for remand because:

> evaluation of a mental impairment is often more complicated
> than the evaluation of a claimed physical impairment
> [because e]vidence of symptom-free periods, which may
> negate the finding of a physical disability, do not compel a
> finding that disability based on a mental disorder has
> ceased.  Mental illness can be extremely difficult to predict,
> and remissions are often of uncertain duration and marked
> by the impending possibility of relapse.

See Reals, 2010 WL 654337, at *3.

Additionally, as discussed above, Roat's lack of candidacy with the Essex staff

is a reason which requires remand as the mistrust and failure to be completely

transparent in therapy is common for those suffering from mental illness.

See Benedict v. Heckler, 593 F. Supp. 755 (E.D.N.Y. 1984) (discussing how those with

mental illnesses are "unlikely to accept treatment prescribed by doctors", but such

predispositions should not automatically result in a denial of benefits because that

would "mock[] the idea of disability based on mental impairments."); see also Reals,

2010 WL 654337, at *2 ("According to the DSM, patients suffering from . . . bipolar

disorder also suffer from . . . poor insight . . . predispos[ing] the individual to

noncompliance with treatment . . . ."); see also Bauer v. Astrue, 532 F.3d 606, 607 (7th

Cir. 2008) (discussing the availability of treatment for bipolar disorder but concluding

that "many patients do not respond well to treatment, or have frequent relapses.")

(citations omitted).

Roat's failure to follow to the prescribed medication regime also raises similar

concerns.  The ALJ pointed to Roat's failure to obtain medical treatment for decades after feeling the initial depressive symptoms and Roat's failure to comply with his prescriptions as grounds that he had other means to alleviate his symptoms which he presumably chose not to utilize.  T. 16.  However, evidence in the record indicates that such behavior, epitomized by Roat's lack of candor, is something which required further re-evaluation and review.  T. 347-52.  Thus, unlike other similar cases where the question of support by substantial evidence was answered in the negative because there was "no medical source opinion stating that [Roat's] failure to seek treatment was a symptom of h[is] mental impairment . . . .", in this case a gap in the record, and the corresponding lack of medical evidence, was identified by a medical source, as was an inferrable request for the ability to supplement the record.  See Richardson v. Astrue, No. 08-CV-142 (SEB/DML), 2009 WL 799543, at *3 (S.D.Ind. Mar. 23, 2009) (remanding case based on ALJ's failure to articulate the weight with which she relied upon medical sources and found claimant's testimony incredible).

Additionally, the law requires the ALJ to consider whether there was a justifiable reason for Roat to discontinue his prescribed treatment.  See SSR 82-59.  The failure to comply with medical treatment may be a function of the disease, thus resulting in a justifiable reason for a claimant refusing to take the prescribed medication.  See Reals, 2010 WL 654337, at *2-*3 (finding that mental health illness resulting in poor judgment and insight "predisposes the individual to noncompliance with treatment . . . ." such that , "on remand, the ALJ should question [claimant's] treating physicians regarding the caue of [his] failure to take [his] medication and the effect, if any, it has on [his] condition."); Grossweiler v. Barnhart, No. SA-02-CA-903, 2003 WL 22454928, at *2-*3

42

(W.D.Tex. Sept. 30, 2003) ("Whether [claiman'ts] failure or even refusal to follow the prescribed treatment was a manifestation of his [mental illness], however, is an entirely different *medical* determination," requiring the court to remand the case back to the ALJ to determine "whether those symptoms can then induce [claimant] to discontinue medications which he knows, when he is rational, he should continue taking . . . .") (emphasis in original).  The ALJ relied on the lack of compliance to illustrate Roat's dishonesty, but the ALJ failed to discuss whether the dishonesty was a character flaw or manifestation of the disease.  See Grossweiller, 2003 WL 22454928, at *3 (detailing that "there [wa]s no medical evidence . . . that demonstrate[d] that [claimant's] discontinuance of his medicine at certain points was not associated with his mental illness.").  If the noncompliance stems from the latter, Roat was not incredible but suffering from more intense symptoms than initially determined.

Therefore, the decision of the Commissioner should also be remanded on this ground.

**E. RFC**

Roat contends that there exists insufficient evidence in the record to support the ALJ's findings regarding his RFC.  RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms. Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945 (2003).  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities

43

are not sufficient." Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine

whether the claimant can perform his or her past relevant work in the national

economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§

404.1545, 416.960 (2003).

Here, the ALJ found that Roat retained the RFC to complete his past relevant

work as an industrial cleaner, which coincided with the general definition of the

vocational position as an industrial cleaner.  T. 16-17.   The ALJ's findings are

questionable however, in regard to the previously discussed gap in the record.  The

ALJ relied upon the testimony from the vocational expert ("VE") and Roat which

indicated that his previous job did not require much contact with others, and given his

mild to moderate social limitations, such limitations were consistent with the job

requirements and Roat could not determine a reason why he could not continue with

substantially similar employment.  T. 17. However, the new medical evidence includes

the examination from the treating physician which gives light on Roat's functional

analysis, which appears to be materially different than that offered by the state

examiners.  T. 402-403.  Given the additional medical information and void established

in the record, the ALJ's decision is questionable as not substantially supported.

Thus, the ALJ's decision should be remanded for reconsideration given the new

medical evidence.


**F. Remand or Reversal**

A reviewing court has the authority to reverse with or without remand.  42

U.S.C. §§ 405(g), 1383(c)(3) (2003).  Remand is appropriate where there are gaps in

the record or further development of the evidence is needed.  Curry, 209 F.3d at 124.

Reversal is appropriate, however, where there is "persuasive proof of disability" in the

record and remand for further evidentiary development would not serve any purpose.

Id.; see also Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).   In this case, there are

appreciable gaps in the record.  Therefore, remand is appropriate and the ALJ should

be directed to consider the additional medical evidence diagnosing Roat with bipolar

disorder, develop the record as necessary to ascertain the proper weight to accord Dr.

Hinsman's RFC, and determine whether Roat's diagnosis and its effects on Roat, his

relationships with Essex and his RFC are sufficient to establish a severe impairment

requiring provision of disability benefits.

During the course of the remand, the ALJ should recontact Dr. Hinsman for

clarification if it is determined that the RFC "lacks adequate detail, explanation or

support."  Mitchell v. Astrue, No. 07-CV-285, 2009 WL 3096717, at *23 (S.D.N.Y. Sept.

28, 2009) (citing 20 C.F.R. §404.1512(e)(1) (requiring "additional evidence or

clarification from [a] medical source when the report from your medical source contains

a conflict or ambiguity that must be resolved, the report does not contain all the

necessary information, or does not appear to be based on medically acceptable . . .

techniques.").  If the record is still inconclusive, the ALJ should supplement it pursuant

to the authority granted in §§ 404.1512 and 416.912.  Id., 2009 WL 3096717, at *24

(citations omitted).  Lastly, if that information is insufficient to base a decision, the ALJ

should order a consultative examination "for the purpose of identifying, to the extent

possible, the symptoms and effects of [Roat's] bipolar disorder . . . ."  Id.

45

**VI. Conclusion**

For the reasons stated above, it is hereby

**RECOMMENDED** that the Commissioner's decision denying disability benefits

BE **REMANDED**.


Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the

foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE**

**TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v.

Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); Fed

R. Civ. P. 72, 6(a), 6(e).



DATED: May 17, 2010
      Albany, New York

_____
United States Magistrate Judge